United States Court of Appeals

 FOR THE DISTRICT OF COLUMBIA CIRCUIT

 Argued April 22, 1999 Decided May 21, 1999 

 No. 98-1075

 Process Gas Consumers Group, et al., 
 Petitioners

 v.

 Federal Energy Regulatory Commission, 
 Respondent

 Tennessee Gas Pipeline Company, et al., 
 Intervenors

 Consolidated with 
 No. 98-1089

 On Petitions for Review of Orders of the 
 Federal Energy Regulatory Commission

 Edward J. Grenier, Jr. argued the cause for petitioners. 
With him on the briefs were Gregory K. Lawrence, Harvey L. 
Reiter, Barbara K. Heffernan and Debra Ann Palmer.

 Andrew K. Soto, Attorney, Federal Energy Regulatory 
Commission, argued the cause for respondent. With him on 
the brief were Jay L. Witkin, Solicitor, and Susan J. Court, 
Special Counsel.

 Michael J. Fremuth argued the cause for intervenor. With 
him on the brief was Shemin V. Proctor. Robert M. Lamkin, 
Barbara K. Heffernan and Debra Ann Palmer entered ap-
pearances.

 Before: Edwards, Chief Judge, Wald and Rogers, Circuit 
Judges.

 Opinion for the Court filed by Circuit Judge Wald.

 Wald, Circuit Judge: Tennessee Gas Pipeline Company 
("Tennessee") filed a tariff revision with the Federal Energy 
Regulatory Commission ("FERC" or "Commission") in 1996. 
The company sought to change the method it uses to allocate 
requests for available capacity on its natural gas pipeline, 
switching from "first come-first served" to "net present val-
ue," or "NPV." Over objections, FERC ultimately approved 
a twenty-year cap on bids evaluated under NPV. It also 
approved the use of NPV to evaluate requests from shippers 
to change the primary points at which their gas enters or 
leaves the pipeline. Numerous petitioners argue that FERC 
failed to engage in reasoned decision making in both instanc-
es in violation of the Administrative Procedure Act ("APA"). 
Petitioners also contend that Tennessee did not give sufficient 
notice that NPV would apply to point change requests. We 
agree with both of petitioners' APA claims and therefore 
grant the petitions for review, remanding the issues to 
FERC, but hold that petitioners lack standing to raise the 
notice claim.

 I. Background

 Tennessee transports natural gas via a pipeline system 
from Louisiana, Texas, and the Gulf of Mexico to areas as far 
north as New England. Prior to the orders at issue in this 

case, Tennessee awarded available firm capacity1 on the 
pipeline on a first come-first served basis; the first shipper to 
submit a request that satisfied the requirements of Tennes-
see's tariff received the capacity. The pipeline found that 
method unsatisfactory:

 Under the first come-first served policy, Tennessee must 
 award capacity to any shipper, even one that requests 
 service for a very short term (which could be for as little 
 as just a few days), if the short-term shipper satisfactori-
 ly submits its request for service as little as one hour 
 before a long term shipper submits its request for ser-
 vice. Plainly, an efficient market would not function in 
 this way, as a merchant exercising rational business 
 judgment would typically favor a creditworthy long-term 
 customer (even if the long-term customer requested a 
 reasonable discount) that ... would provide more overall 
 benefits than those provided by the short-term customer. 
 Similar inefficiencies arise where a short-haul shipper 
 submits its request for service prior to another shipper 
 that wishes to transport gas to points further down-
 stream or upstream.
 
Letter from Marguerite N. Woung, Attorney, Tennessee Gas 
Pipeline Company, to Lois D. Cashell, Secretary, FERC 3 
(June 12, 1996). Pursuant to section four of the Natural Gas 
Act, 15 U.S.C. s 717c, Tennessee therefore submitted tariff 
revisions to FERC on June 12, 1996, proposing a change from 
the first come-first served method of evaluating capacity 
requests to the NPV method.2 The change would be accom-
plished through the addition to Tennessee's tariff of a new 

__________
 1 "Pipelines generally offer two forms of transportation service: 
firm transportation, for which delivery is guaranteed, and interrup-
tible transportation, for which delivery can be delayed if all the 
capacity on the pipeline is in use." United Distribution Cos. v. 
FERC, 88 F.3d 1105, 1123 n.10 (D.C. Cir. 1996); see Municipal 
Defense Group v. FERC, 170 F.3d 197, 198 n.1 (D.C. Cir. 1999).

 2 The same submission involved another tariff revision--elimina-
tion of the requirement that pipeline service commence within 
ninety days of a request for service--that is not at issue here.

section five, entitled "Awards of Generally Available Capaci-
ty." Under NPV, Tennessee would announce an open season 
each time it wanted to sell available capacity. The highest 
bidder during the open season, based on the net present value 
of the bid, would receive the capacity (absent unusual circum-
stances). This approach would take into account differences 
in the proposals such as price, volume of gas, and duration of 
contract. Using more technical language, Tennessee de-
scribed the NPV of a bid as the "discounted cash flow of 
incremental revenues per dekatherm to Transporter pro-
duced, lost or affected...."

A. The Twenty-Year Cap

 Tennessee's initial proposal did not include or discuss a cap 
on the length of a bid that would be considered in NPV 
calculations. A cap may prevent an end run around the 
maximum rates approved by FERC, a concern when monopo-
ly conditions are present. See United Distribution Cos. v. 
FERC, 88 F.3d 1105, 1140 (D.C. Cir. 1996) ("UDC") ("Com-
peting bidders who come up against the rate ceiling for this 
scarce resource--capacity on constrained pipelines--may bid 
up the length of the contract term to try to win the auction. 
In effect, bidding for a longer contract term becomes a 
surrogate for bidding beyond the maximum rate level."). A 
cap functions like this: under a ten year cap, two shippers 
who want to submit otherwise identical fifteen and twelve 
year bids cannot; they are limited to ten year bids, producing 
the same NPV, and a tiebreaker determines the winner.3 
Without the cap, the fifteen year bidder wins. The goal of a 
cap in a monopoly situation, just as with the setting of 
maximum rates, is to simulate the end product of a competi-
tive market. See Stephen G. Breyer & Richard B. Stewart, 
Administrative Law and Regulatory Policy 237 (3d ed. 1992) 
("In principle, ratemaking might be thought to have as its 

__________
 3 A cap could function somewhat differently, permitting the filing 
of the fifteen and twelve year bids but only counting the first ten 
years in the NPV calculation. The winner would then obtain a 
contract for longer than ten years. Tennessee's cap does not 
appear to work this way.

object the setting of prices equal to those that the firm would 
set if it did not have monopoly power; i.e., to replicate a 
'competitive price.' "). Bids in a competitive market limited 
in duration to ten years thus help to prevent a pipeline's 
market power from causing market distortions.

 A month after its June 12 filing, Tennessee addressed 
concerns raised by Process Gas Consumers Group ("Process 
Gas"), an association of industrial users of natural gas and 
one of the petitioners here, about the lack of a cap. Instead 
of incorporating a cap in the tariff itself, however, Tennessee 
stated that it would "include a cap on the duration of any bid 
as part of the open season posting ... that is applicable to 
the particular service being offered." Response of Tennessee 
Gas Pipeline Company to Protests to NPV Filing at 6.

 FERC ruled on Tennessee's proposed revisions on July 31, 
1996, generally approving of the switch from first come-first 
served to NPV:

 A net present value evaluation ... allocates capacity to 
 the shipper who will produce the greatest revenue and 
 the least unsubscribed capacity. As such, it is an eco-
 nomically efficient way of allocating capacity and is con-
 sistent with Commission policy.
 
Tennessee Gas Pipeline Company, 76 F.E.R.C. p 61,101, at 
61,522 (1996) ("Tennessee Gas I"). FERC was not wholly 
satisfied, however, and while it accepted the filing (with a 
minimal suspension period), it did so subject to certain condi-
tions. One condition involved the cap: "Tennessee should 
explain why it proposes to vary the cap on a transaction by 
transaction basis rather than include a uniform cap in its 
tariff." Id. at 61,519. In response, Tennessee proposed a 
twenty-year cap: "Since bids beyond the 20th year are un-
likely to have a significant impact on the NPV analysis, 
Tennessee is willing to include in its tariff a 20-year limita-
tion on the NPV bids." Letter from Marguerite N. Woung, 
Attorney, Tennessee Gas Pipeline Company, to Lois D. Ca-
shell, Secretary, FERC 6 (Aug. 15, 1996).

 During the same time period, a cap had become an issue in 
a different circumstance arising out of FERC's Order No. 

636, part of the restructuring of the natural gas industry. In 
our review of Order No. 636, we addressed a twenty-year cap 
selected by FERC in the right-of-first-refusal context.4 Be-
cause FERC failed to adequately explain why twenty years 
would protect shippers from pipelines' market power and why 
it relied on the lengths of one specific type of contract (those 
involving the construction of new facilities) in coming up with 
that figure, we remanded the cap for a better justification. 
See UDC, 88 F.3d at 1140-41. On February 27, 1997, FERC 
acknowledged on remand that it could not offer a more 
adequate basis for a twenty-year cap, see Order No. 636-C, 
Pipeline Service Obligations and Revisions to Regulations 
Governing Self-Implementing Transportation Under Part 
284 of the Commission's Regulations, Regulation of Natural 
Gas Pipelines After Partial Wellhead Decontrol, 78 F.E.R.C. 
p 61,186, at 61,773 (1997) ("Order No. 636-C") ("The Commis-
sion can find no additional record evidence, not previously 
cited to the Court, that would support a cap as long as the 
twenty-year cap chosen in Order No. 636."), and reduced the 
cap to a five-year one. See id. at 61,774.5 Process Gas, 

__________
 4 We described that context as follows:

 The right-of-first-refusal mechanism consists principally of two 
 matching requirements: rate and contract term. Near the end 
 of a long-term firm-transportation contract, the existing cus-
 tomer may notify the pipeline that it intends to exercise its 
 right of first refusal. The pipeline must post the availability of 
 that capacity on its electronic bulletin board and, in accordance 
 with the criteria set forth in its tariff, identify the "best bid" 
 offered by any competing shippers. The customer then has the 
 right to match the competing bid's rate, up to the maximum 
 "just and reasonable" rate that the Commission has approved 
 for that service, and the competing bid's contract term. Com-
 peting shippers may choose to bid for only a portion of the 
 capacity in the expiring contract.
 
UDC, 88 F.3d at 1138 (internal citations omitted).

 5 A petition for review of the cap selected in Order No. 636-C is 
currently pending. See Interstate Natural Gas Ass'n of America v. 
FERC, No. 98-1333 (D.C. Cir. filed July 22, 1998) (in abeyance).

which asked for a cap of ten years in a June 24, 1996 response 
to Tennessee's initial filing and in an August 30, 1996 request 
for rehearing of Tennessee Gas I, reduced its request to five 
years in light of Order No. 636-C on April 11, 1997.6

 FERC approved the twenty-year cap for NPV on June 3, 
1997:

 Differing economic environments may dictate differing 
 durations of service if Tennessee is to generate maximum 
 use of its system and maximum revenues. Market forces 
 can be the determinant of duration of service, and to 
 place a uniform cap in place could stifle those forces. 
 Protesters have not offered persuasive arguments for 
 either a uniform cap, or for a cap shorter than twenty 
 years. The Commission disagrees with Process Gas that 
 the policy justifications of Order No. 636-C apply simi-
 larly to this situation. As Tennessee points out, in Order 
 No. 636-C, the five-year cap is imposed to protect exist-
 ing customers from being forced into longer-term con-
 tract extensions than they desire under the right-of-first-
 refusal. Here, there is no reason for the Commission to 
 impose a shorter cap for new capacity, unlike the case of 
 capacity subscribed under existing contracts. Under the 
 instant proposal, market forces can determine the dura-
 tion of service for the new, or newly available capacity 
 within whatever cap Tennessee proposes for that particu-
 lar transaction. Bidders are not forced into the maxi-
 mum duration which in any event is limited to no more 
 than twenty years. Rather, the primary issue here, is 
 whether when two shippers both desire new capacity 
 should that capacity go to a shipper who values it more, 
 i.e., for a longer term, than another shipper who might 
 value it less. The Commission will accept Tennessee's 
 proposal.
 
Tennessee Gas Pipeline Company, 79 F.E.R.C. p 61,297, at 
62,339 (1997) ("Tennessee Gas II") (footnote omitted). In a 
footnote, FERC added:

__________
 6 Process Gas was not the only party to argue that Tennessee's 
proposed twenty-year cap was too long.

 The Commission considers twenty years to be the maxi-
 mum length of time that can be considered reasonable in 
 this context. Any longer or the consideration of unlimit-
 ed periods of time would be allowing an unduly discrimi-
 natory exercise of monopoly power.
 
Id. at 62,339 n.11. Rehearing of Tennessee Gas I was denied 
at the same time. See id. at 62,334. On January 14, 1998, 
FERC denied rehearing of Tennessee Gas II and again 
rejected objections to a cap length of twenty years:

 The Commission does not find the application of the 20-
 year NPV criteria to be an application of monopoly 
 power in and of itself. Even though Tennessee has 
 monopoly power irrespective of the length of the contract 
 term, it still must have a rational way of allocating 
 available capacity. Process Gas simply raises speculation 
 that the cap will lead to unreasonable results. A 20-year 
 cap is consistent with Commission policy of allowing 
 those who value capacity the highest, including those who 
 value longer-term contracts, to acquire the capacity. In 
 fact, we believe that with the lower turnover in contracts 
 with such a cap, economic efficiency is increased, and the 
 public interest is better served. Nor is the right-of-first-
 refusal matching procedure relevant. The right-of-first-
 refusal procedure was formulated with the purpose of 
 protecting the existing shipper. Here, the existing ship-
 per has no more stake in the outcome of the bidding 
 process regarding newly available capacity than any oth-
 er shipper and has no right to that capacity which 
 requires protection. Accordingly, based on the forego-
 ing, and without any evidence that 20 years is unjust and 
 unreasonable in this context, we find that the 20-year 
 cap is adequately supported.
 
Tennessee Gas Pipeline Company, 82 F.E.R.C. p 61,008, at 
61,026-27 (1998) ("Tennessee Gas III") (footnotes omitted). 
FERC further justified its approval by stating that "[i]t is 
still common to find longer lengths of commitment for new 
service." Id. at 61,026 n.6. In support of that proposition, 
FERC cited three of its previous decisions involving ten and 

fifteen year agreements, known in the industry as "precedent 
agreements," between shippers and pipelines for capacity on 
yet to be constructed facilities.7 See id. The pipelines, 
seeking authority from FERC to proceed with the planned 
construction, submitted the agreements to demonstrate de-
mand for the new capacity.

B. Meter Amendments

 When natural gas is shipped through a pipeline, the points 
at which the gas enters and leaves the system are called 
"receipt" and "delivery" points, respectively. A firm trans-
portation shipper selects "primary" receipt and delivery 
points; these points are part of its contract with the pipeline. 
Designating a point as primary guarantees the shipper use of 
the point, an important right when the pipeline lacks suffi-
cient capacity at the point to satisfy demand. Firm shippers 
can select other points on a secondary basis, but can only use 
those points if there is sufficient capacity beyond that taken 
by shippers using them on a primary basis. A change in a 
primary receipt or delivery point is sometimes referred to as 
a "meter amendment" because gas is measured at these 
points. Section 4.7 of Tennessee's relevant rate schedule 
discusses meter amendments:

 Change of Primary Points: Subject to agreement by 
 Transporter, a Shipper may elect to substitute new 
 points for the Primary Delivery or Receipts in its service 
 agreement. Such changes may be affected by prior 
 notice to Transporter of 30 days if in writing or 15 days if 
 by the TENN-Speed 2 [electronic bulletin board] sys-
 tem. All such changes must be reflected in an amended 
 service agreement and shall be effective at commence-
 ment of the following month. Transporter shall not be 
 required to accept an amendment if there is inadequate 
 
__________
 7 FERC miscited the third of these decisions. The correct cita-
tions are: Transcontinental Gas Pipe Line Corp., 81 F.E.R.C. 
p 61,104 (1997); Tennessee Gas Pipeline Co. and Distrigas of 
Massachusetts Corp., 79 F.E.R.C. p 61,375 (1997); Northern Natu-
ral Gas Co., 79 F.E.R.C. p 61,046 (1997).

 capacity available to render the new service or if the 
 change would reduce the reservation charges applicable 
 to the agreement.
 
 In Tennessee Gas I, issued on July 31, 1996, FERC did not 
discuss the effect of the change from first come-first served to 
NPV on the meter amendment process. Nor had the matter 
been explicitly addressed to that point by Tennessee or other 
interested parties. On August 21 or 22, 1996, however, in a 
posting on its electronic bulletin board Tennessee made crys-
tal clear that it would apply the new method to primary point 
change requests. A meter amendment request would trigger 
an open season and the requestor would have to compete with 
other interested shippers on the basis of NPV.

 A number of parties protested, arguing, inter alia, that 
applying NPV to meter amendment requests is inconsistent 
with FERC's professed aim of assuring that firm shippers 
have receipt and delivery point flexibility, see Tennessee Gas 
II, 79 F.E.R.C. at 62,335-36 & n.5, and that the change would 
"give new customers a priority over existing customers since 
the existing customers['] NPV will be zero."8 Id. at 62,337. 
FERC disagreed:

 The Commission considers that the NPV criteria may 
 be rightfully applied to requests for changes in receipt 
 and delivery points. A request for a change in a receipt 
 or delivery point is a request for capacity that is general-
 ly available at that new point. To apply the NPV criteria 
 is to allocate that capacity to the entity that values it the 
 most, and this is consistent with Commission policy. The 
 Commission has previously discussed the desirability of 
 
__________
 8 The source of existing shippers' difficulty under NPV is that 
Tennessee calculates the magic NPV number by looking at the net 
or incremental gain in revenue that the award of the capacity at the 
designated point will produce. If an existing shipper seeks merely 
to change from one primary point to another in the same zone, its 
payments to the pipeline will not change and the NPV of its bid will 
be zero; the amount it was already obligated to pay under the 
contract counts for nothing.

 the economic efficiency achieved by allocating capacity to 
 parties who value it the most. Here, Tennessee seeks to 
 allocate available receipt and delivery point capacity to 
 the parties who value it the most, a proposal that is not 
 inconsistent with Commission policy. Existing shippers 
 have the right to bid on the generally available receipt 
 and delivery point capacity, just as new or other existing 
 shippers do. There is no reason to grant a preferential 
 right to unsubscribed capacity to existing shippers. 
 Moreover, nothing in these changes affects the rights of 
 parties to use these points on a secondary basis. The 
 Commission considers that in responding to short term 
 changes, such as a temporary force majeure event (as in 
 New England's example of a hurricane), use of an open 
 receipt point on [a] secondary basis would be both logical 
 and unaffected by the NPV proposal.
 
Id. (footnotes omitted).

 In denying rehearing of Tennessee Gas II, FERC again 
rejected objections to its approval of Tennessee's application 
of the new NPV allocation method to meter amendment 
requests, see Tennessee Gas III, 82 F.E.R.C. at 61,027-29, 
despite arguments by existing shippers that using NPV se-
verely degrades their service because of increased difficulty 
in obtaining point changes. The shippers also argued on 
rehearing that using NPV for meter amendment requests is 
unduly discriminatory because even a de minimus bid from a 
new shipper creates some incremental value while a point 
change request from an existing shipper produces an NPV of 
zero. See id. at 61,028.

 As we understand it, FERC's response reflects two propo-
sitions. First, allocating capacity to the highest bidder is 
appropriate because it is efficient. Second, existing shippers, 
at least in some cases, are able to compete with new shippers 
on the basis of NPV for capacity at a receipt or delivery 
point. With respect to the latter, FERC stated:

 Moreover, there are other ways an existing shipper's bid 
 can render incremental value. If it is paying a discount-
 ed rate, it can increase the rate offered. It also can 
 
 increase the amount of overall capacity requested or 
 extend the zones its service covers.
 
Id. at 61,028 n.17. Responding to the example of the de 
minimus bidder who would trump the existing shipper of 
whatever amount, FERC replied that "[i]t is economically 
more efficient to award the capacity to the bidder who is 
willing to pay something extra for that capacity." Id. at 
61,029.

 II. Discussion

 Process Gas filed a petition for review of Tennessee Gas I, 
Tennessee Gas II, and Tennessee Gas III on February 23, 
1998.9 Numerous parties, including Tennessee, intervened. 
Bay State Gas Company ("Bay State") and other natural gas 
companies that operate in the northernmost zone of Tennes-
see's pipeline system filed another petition for review on 
March 12, 1998. These cases were consolidated along with a 
third, City of Clarksville v. FERC, No. 98-1099 (D.C. Cir. 
filed Mar. 16, 1998), later severed. See Process Gas Consum-
ers Group v. FERC, No. 98-1075 (D.C. Cir. Apr. 29, 1998). 
Petitioners argue that FERC violated the APA by failing to 
adequately support its decisions to approve (1) the twenty-
year cap and (2) Tennessee's use of the NPV method for 
evaluating meter amendment requests. They argue further 
that Tennessee did not provide adequate notice under 15 
U.S.C. s 717c(d) that its proposal affected meter amendment 
requests.

A. The Twenty-Year Cap

 The natural gas transportation industry is a natural monop-
oly; pipelines maintain an economically powerful position in 
relation to their customers. See, e.g., UDC, 88 F.3d at 1122. 
Congress sought to address this problem in 1938 by enacting 
the Natural Gas Act, ch. 556, 52 Stat. 821 (1938) (codified as 
amended at 15 U.S.C. ss 717-717(w)) ("NGA"), the "primary 

__________
 9 An earlier petition for review filed by Process Gas was dis-
missed as premature. See Process Gas Consumers Group v. 
FERC, No. 97-1458 (D.C. Cir. Nov. 4, 1997).

aim" of which is "to protect consumers against exploitation at 
the hands of natural gas companies." Federal Power 
Comm'n v. Hope Natural Gas Co., 320 U.S. 591, 610 (1944); 
see also Public Sys. v. FERC, 606 F.2d 973, 979 n.27 (D.C. 
Cir. 1979) ("control of the economic power of utilities that 
enjoy monopoly status" is the focus of regulation under the 
NGA and the Federal Power Act). In exercising the authori-
ty granted by the NGA to review rate changes proposed by 
pipelines, FERC must remain attuned to the status of the 
affected market vis-a-vis monopoly and competition.10 If the 
market is not a monopolistic one, market-based prices are 
presumed to be proper. See Elizabethtown Gas Co. v. FERC, 
10 F.3d 866, 870 (D.C. Cir. 1993) ("when there is a competi-
tive market the FERC may rely upon market-based prices 
... to assure a 'just and reasonable' result"). If the market 
is dominated by one or a few companies, FERC uses devices 
such as a rate ceiling that compensate for the imbalance in 
market power. This same concern is present as well when 

__________
 10 The statutory standards FERC uses to assess rate proposals 
are found in 15 U.S.C. s 717c(a)-(b):

 (a) Just and reasonable rates and charges
 
 All rates and charges made, demanded, or received by any 
 natural-gas company for or in connection with the transporta-
 tion or sale of natural gas subject to the jurisdiction of the 
 Commission, and all rules and regulations affecting or pertain-
 ing to such rates or charges, shall be just and reasonable, and 
 any such rate or charge that is not just and reasonable is 
 declared to be unlawful.
 
 (b) Undue preferences and unreasonable rates and charges 
 prohibited
 
 No natural-gas company shall, with respect to any transporta-
 tion or sale of natural gas subject to the jurisdiction of the 
 Commission, (1) make or grant any undue preference or ad-
 vantage to any person or subject any person to any undue 
 prejudice or disadvantage, or (2) maintain any unreasonable 
 difference in rates, charges, service, facilities, or in any other 
 respect, either as between localities or as between classes of 
 service.
 
FERC looks at pipeline-shipper contract terms other than 
price. See UDC, 88 F.3d at 1140 (increased contract length 
can be a surrogate for bidding over the maximum approved 
rate); Tejas Power Corp. v. FERC, 908 F.2d 998, 1004 (D.C. 
Cir. 1990) ("[i]n a competitive market, where neither buyer 
nor seller has significant market power, it is rational to 
assume that the terms of their voluntary exchange are rea-
sonable"); Tennessee Gas II, 79 F.E.R.C. at 62,342 ("both the 
Commission and the courts carefully scrutinize use of [length 
of term] and place limits on it to be sure that there is not 
undue exercise of monopoly power").

 In this case FERC acknowledges that the market served 
by Tennessee's pipeline has monopolistic characteristics. See 
Tennessee Gas III, 82 F.E.R.C. at 61,026; Tennessee Gas II, 
79 F.E.R.C. at 62,339 n.11. The question for us then is 
whether FERC has adequately justified its conclusion that a 
twenty-year cap will function to assure that the NPV method 
of awarding available capacity is "just and reasonable." 15 
U.S.C. s 717c(a). That is, whether it will prevent the NPV 
method from compelling shippers to offer the pipeline longer 
contracts than they would in a competitive market. We have 
recognized that a cap is "necessarily [a] somewhat arbitrary 
figure," but that acknowledgment does not free FERC of its 
obligation to "provide[ ] substantial evidence to support its 
choice and respond[ ] to substantial criticisms of that figure." 
UDC, 88 F.3d at 1141 n.45. Reasoned decision making, which 
we find absent here in several respects, remains a regulatory 
essential, even when the agency tools are rough ones.

 As previously noted, FERC supported its approval of the 
twenty-year cap by pointing to three previous Commission 
decisions involving ten and fifteen year precedent agree-
ments. Because every market for natural gas pipeline trans-
portation does not suffer from monopoly conditions, see Al-
ternatives to Traditional Cost-of-Service Ratemaking for 
Natural Gas Pipelines, 74 F.E.R.C. p 61,076 (1996), consider-
ing the range of negotiated firm transportation contract 
lengths can be a defensible way of determining the adequacy 
of a particular cap. Of course, when FERC approves a cap 
the contract data it relies on must support its decision. Here 

FERC's orders fall short by neglecting to explain why the 
existence of ten and fifteen year precedent agreements sup-
ports a twenty-year cap. Given these numbers, we might 
have expected FERC to refuse to allow Tennessee to use a 
cap of more than fifteen years, not twenty years; assuming 
that competitive market contracts typically run to no more 
than fifteen years, a twenty-year cap would allow Tennes-
see's market power to induce excessively long bids. We do 
not mean to say that a twenty-year cap can never be justified 
from these numbers, only that there must be some (rational) 
explanation of the link between the numbers and the cap. 
We see none here.

 FERC must also explain its choice of a data set in the face 
of an objection. See UDC, 88 F.3d at 1141 (cap remanded in 
part because FERC looked at the lengths of contracts involv-
ing the construction of new pipeline facilities and then failed 
to respond to the objection that this was the wrong type of 
contract to consider). Petitioners called for the same five-
year cap as the Commission selected on remand from UDC in 
Order No. 636-C for the right-of-first-refusal context, asking 
that the data relied on in that proceeding be used in the 
evaluation of Tennessee's cap. In that order, FERC went 
well beyond a cursory citation to a few contracts and re-
viewed data from pipelines' quarterly electronic filings. See 
Order No. 636-C, 78 F.E.R.C. at 61,773. It summarized the 
data as follows:

 For pre-Order No. 636 long-term contracts, the average 
 term was approximately 15 years. The data show that 
 since Order No. 636, pipelines have entered into substan-
 tially shorter contracts than before. Post-Order No. 636 
 long-term contracts had an average term of 9.2 years for 
 transportation, and 9.7 years for storage. For all cur-
 rently effective contracts (both pre- and post-Order No. 
 636), the average term is 10.3 years for transportation 
 and 10 years for storage. Moreover, ... the trend 
 toward shorter contracts is continuing. About one quar-
 ter to one third of contracts with a term of one year or 
 greater, entered into since Order No. 636, have had 
 
 terms of one to five years. However, nearly one half of 
 such contracts entered into since January 1, 1995, have 
 had terms of one to five years....
 
 The industry trend thus appears to be contract terms 
 that are much shorter than twenty years.
 
Id. at 61,774 (footnotes omitted). In Tennessee Gas II and 
III, FERC rejected the proposition that this discussion in 
Order 636-C is relevant to the instant situation. It reasoned 
that the right-of-first-refusal process protects existing ship-
pers as opposed to the present circumstances where Tennes-
see is conducting an open season for generally available 
capacity and there are no existing shippers that stand to lose 
their capacity and thus require protection. This, however, 
seems to us a distinction without a difference. The NGA 
aims to protect all shippers and potential shippers from 
pipelines' excessive market power, not just existing shippers 
faced with an expiring contract. If the data relied on in 
Order No. 636-C is not relevant in this context, FERC has 
yet to tell us why.

 Apart from these concerns, we find FERC's reasoning on 
the cap to be unpersuasive and largely conclusory. In the 
orders under review, FERC frequently refers to its goal of 
encouraging the allocation of pipeline capacity to parties 
willing to pay the most for it. See, e.g., Tennessee Gas II, 79 
F.E.R.C. at 62,337 ("The Commission has previously dis-
cussed the desirability of the economic efficiency achieved by 
allocating capacity to parties who value it the most." (footnote 
omitted)). We do not quarrel with that goal, but remind 
FERC of its admitted need to balance the goal with its duty 
to prevent exploitation of Tennessee's monopoly power. 
FERC appears to have forgotten the latter in its focus on 
maximizing pipeline revenue:

 Under the instant proposal, market forces can determine 
 the duration of service for the new, or newly available 
 capacity within whatever cap Tennessee proposes for 
 that particular transaction.
 
 ...
 
 [T]he primary issue here, is whether when two shippers 
 both desire new capacity should that capacity go to a 
 shipper who values it more, i.e., for a longer term, than 
 another shipper who might value it less.
 
Id. at 62,339.

 A 20-year cap is consistent with Commission policy of 
 allowing those who value capacity the highest, including 
 those who value longer-term contracts, to acquire the 
 capacity.
 
Tennessee Gas III, 82 F.E.R.C. at 61,026 (footnote omitted). 
To the limited extent that FERC answered claims that the 
cap is too long given the market power problem, its state-
ments appear to be disconnected and on occasion contradicto-
ry:

 Bidders are not forced into the maximum duration which 
 in any event is limited to no more than twenty years.
 
 Any longer or the consideration of unlimited periods of 
 time would be allowing an unduly discriminatory exercise 
 of monopoly power.
 
Tennessee Gas II, 79 F.E.R.C. at 62,339 & n.11.

 The Commission does not find the application of the 20-
 year NPV criteria to be an application of monopoly 
 power in and of itself.
 
Tennessee Gas III, 82 F.E.R.C. at 61,026. Once the Commis-
sion acknowledged that there is a monopoly problem, it was 
obligated to take the problem seriously and confront it with a 
forthright explanation of why a twenty-year cap would not 
augment that power. Cf. Laclede Gas Co. v. FERC, 997 F.2d 
936, 947 (D.C. Cir. 1993) (in determining whether to accept a 
proposed settlement, it is appropriate for FERC to consider 
the possibility of protracted litigation; however, it "must 
indicate why the interest in avoiding lengthy and difficult 
proceedings warrants acceptance of this particular settle-
ment"). Instead, the orders seem to suggest that FERC 
approved the twenty-year cap because, functionally, twenty 

years would amount to no cap at all. This is hardly rational 
decision making.

B. Meter Amendments

 As with the twenty-year cap, FERC's explanation for ap-
plying NPV to meter amendments emphasized the maximiza-
tion of pipeline revenue. Once again, however, the Commis-
sion fell short in addressing an important countervailing 
concern--this time, the ability of existing shippers to change 
primary points. Throughout the administrative proceedings, 
petitioners stressed the importance of receipt and delivery 
point flexibility to shippers and their belief that, under NPV, 
much flexibility would be lost due to the inability of existing 
shippers seeking new meter points under changed market 
circumstances to outbid new shippers. Petitioners cited the 
example of a shipper whose original source of natural gas has 
dried up necessitating a change of a receipt point to a 
different supplier at a different location. The inability to 
switch points to meet such exigencies can cause disruptions 
not just for shippers, but for end users as well.

 FERC's response was that, contrary to petitioners' claims, 
in many cases existing shippers actually can compete with 
new bidders for changed meter points on the basis of NPV. 
Despite the disadvantage faced by existing shippers stem-
ming from the pipeline's focus on incremental revenue only, 
FERC suggested ways in which an existing shipper can 
generate a bid with a positive value: "If it is paying a 
discounted rate, it can increase the rate offered. It also can 
increase the amount of overall capacity requested or extend 
the zones its service covers."11 Tennessee Gas III, 82 
F.E.R.C. at 61,028 n.17. But the petitioners make a good 
case that these options are largely illusory in the majority of 
cases. It is often impossible to offer a higher rate or to 
request more capacity because the only pipeline capacity that 
could be of any use to the existing customer is al-
ready spoken for. Extending zones is impossible for shippers 
using delivery points in the northernmost zone and receipt 
points in the southernmost and commercially infeasible for 

__________
 11 The pipeline is evidently divided into seven zones, numbers 
zero through six.

many other shippers. Even when an existing shipper can 
produce an NPV higher than zero, it is easier for a new 
shipper to go even higher than for an existing shipper. By 
improperly minimizing the difficulty that existing shippers 
will face in the NPV process when they request meter 
amendments, FERC failed to seriously address the problems 
that the use of NPV might cause for existing shippers.

 FERC also suggested that shippers unable to obtain a 
point on a primary basis can use it on a secondary basis.12 
This secondary option has substantially diminished utility 
because it does not guarantee access to the point over any 
fixed period of time.

 At the end of the day, though, FERC's position is that 
regardless of the ability of existing shippers to compete on 
the basis of NPV or to meet their needs by using secondary 
points, it is best to award primary point capacity on the basis 
of the amount of additional revenue generated for Tennessee. 
If existing shippers are injured, so be it. The orders under 
review suggest this bottom line and at oral argument FERC 
counsel appeared to endorse it. While awarding capacity to 
the party who will increase the pipeline's revenues the most is 
certainly one proper consideration in establishing a new price 
regime, we think it was unreasonable for FERC to ignore the 
serious potential problems for existing shippers highlighted 
by petitioners. Existing shippers into entered into their 
contracts with Tennessee with an expectation of a certain 
amount of primary point flexibility. When the pipeline pro-
poses to take away that flexibility altogether or reduce it 
substantially, FERC is obligated to provide a better explana-
tion of why the shippers' resultant loss cannot be taken into 
account in a more balanced application of the NPV pricing 
system. This includes explaining why an alternative ap-
proach suggested by petitioners--crediting to a bid some 
portion of the payments already obligated instead of incre-

__________
 12 The NPV capacity allocation method does not affect secondary 
points.

mental revenue only--is not preferable to the approach 
FERC approved.

C. Notice of Change in Meter Amendment Process

 Petitioners also contend that Tennessee's initial filing failed 
to give adequate notice that NPV would be applied to re-
quests for meter amendments. They say that they only 
realized Tennessee's intent when they read the pipeline's 
electronic bulletin board posting in the latter part of August 
1996. The notice requirement is imposed by 15 U.S.C. 
s 717c(d):

 Unless the Commission otherwise orders, no change shall 
 be made by any natural-gas company in any such rate, 
 charge, classification, or service, or in any rule, regula-
 tion, or contract relating thereto, except after thirty 
 days' notice to the Commission and to the public. Such 
 notice shall be given by filing with the Commission and 
 keeping open for public inspection new schedules stating 
 plainly the change or changes to be made in the schedule 
 or schedules then in force and the time when the change 
 or changes will go into effect.
 
FERC twice rejected the claim of inadequate notice. See 
Tennessee Gas III, 82 F.E.R.C. at 61,027; Tennessee Gas II, 
79 F.E.R.C. at 62,337.

 We agree with FERC that petitioners lack standing to 
raise this issue because they fail to satisfy standing's injury 
prong; the injury they allege is too speculative. See Office of 
the Consumers' Counsel v. FERC, 808 F.2d 125, 128-29 (D.C. 
Cir. 1987) (to have standing, a party seeking judicial review of 
a FERC order must allege a non-speculative harm). Peti-
tioners assert that, "had Tennessee's customers received pri-
or notice of the tariff change FERC ultimately approved, 
they might well have made changes to their primary receipt 
or delivery points before the tariff change took effect." Joint 
Reply Br. for Pet'rs at 20 (emphasis in original). "Might well 
have" sounds speculative, especially in this context. The 
method used by Tennessee to evaluate point change requests 
would seem to have little or no effect on the need or even 
desirability, from the standpoint of a shipper, of a point 
change. Thus, we expect that any point change request that 
"might well have" been made before the tariff change was 

implemented on August 1, 1996, would have been lodged 
before or after that date. Yet petitioners point to no such 
point change requests that were denied. If opportunities for 
meter amendments were actually missed, petitioners should 
have been able to cite them.

 III. Conclusion

 The petitions for review are granted. We remand to the 
Commission to better explain or modify its approval of the 
twenty-year cap and of Tennessee's use of the NPV method 
of allocating pipeline capacity in the context of requests from 
existing shippers for meter amendments. We do not reach 
petitioners' notice claim for lack of standing.